IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

MARC M.,on behalf of his minor   )     Civ. No. 10-00195 DAE/LEK
son, AIDAN M.,               )
                                  )
          Plaintiffs,      )
                                  )
     vs.                   )
                                  )
DEPARTMENT OF EDUCATION,   )
STATE OF HAWAII,          )
                                  )
          Defendant.      )
_____  )

ORDER VACATING AND REMANDING DECISION
OF HEARINGS OFFICER

On January 24, 2011, the Court heard Plaintiffs' appeal of a decision

rendered by an administrative hearings officer concerning the denial of a student's

individualized education program.  Susan Dorsey, Esq., and Stan Levin, Esq.,

appeared at the hearing on behalf of Plaintiffs, Deputy Attorney General Berton T.

Kato appeared at the hearing on behalf of Defendant Department of Education

("Defendant").  After reviewing the appeal, and the supporting and opposing

briefs, the Court **VACATES** the Hearings Officer's Findings of Fact, Conclusions

of Law and Decision and **REMANDS** the case to the Defendant Department of

Education.

## BACKGROUND

I.    <u>Factual Background</u>

Aidan M. ("Student") is a thirteen-year-old student eligible for special education services as a result of his diagnosis of attention deficit hyperactivity disorder ("ADHD").  (Doc. # 14, Administrative R. on Appeal ("ROA"), Ex. 18, 115.)  From Fall 2006 to Spring 2008, Student attended Assets School ("Assets") pursuant to two settlement agreements between Student, his parents (collectively "Plaintiffs"), and Defendant.  (<u>Id.</u>)

On June 9, 2008, the IEP team met and developed an IEP for Student for the 2008 to 2009 school year.  (<u>Id.</u> at 118.)  His prior levels of educational placement ("PLEP") varied from subject to subject and ranged from deficient in mathematics to average in reading and writing.  (Doc. # 16, Resp't Exs. ("RET"), Ex. 4, 28–29.)  With respect to Student's behavior, the PLEP noted that inattention and hyperactivity continued to be a problem and that anxiety and depression were also areas of concern.  (<u>Id.</u> at 29.)  The June 9, 2008 IEP addressed these concerns and Student, for the 2008–2009 school year, again attended Assets.  (ROA, Ex. 18, at 120–22.)

The IEP team reconvened in September 2009 to evaluate Student's performance as well as determine what additional data was needed to define his

needs.  (Id. 122.)  The team added additional objectives to Student's language arts and oral communication goals and added 540 minutes per quarter of speech-language therapy to his IEP.  (Id.)  One month later, in October of 2008, Student changed medication for his ADHD; both Student's father and his teacher noticed a marked improvement in his behavior.  (Id. at 123; Doc. # 12, Tr., 41.)

On November 14, 2008, the Home School Special Education Care Coordinator ("Care Coordinator") and the District Resource Teacher observed Student at Assets and noticed that Student was responding well to activities but also reported that Student continued to struggle with completing and turning in homework assignments.  (ROA, Ex. 18, at 123.)  On December 8, 2008, a DOE Speech Therapist observed Student and noted that while he still had needs, he positively interacted with his teacher and peers.  (Id. at 124.)  On February 26, 2009, Assets provided Defendant a Status Report for Student.  (Id. at 125.)  One day later, Plaintiffs paid $500.00 towards enrolment at Assets for the 2009–2010 school year.  (Id. at 126.)

In May 2009, Student was given a standardized test and received the same score he did a year earlier.  (Id. at 127.)  Student was again observed by Defendant who determined that Student could wait in line, follow directions, and help his peers clean up.  (Id. at 127–28.)

On June 1, 2009, the IEP team met to develop Student's IEP for the 2009–2010 school year. The PLEP was updated to include the latest standardized test score, the latest observations, and concerns raised by the Student's parents ("Parents") at the IEP meeting. (Id.) The goals remained substantially the same as the 2008 IEP, (id.,) as did the behavioral support plan. (Id. at 130.) According to the IEP, however, Student was to attend Niu Valley Middle School ("Niu Valley"), the home public school, instead of Assets for the 2009–2010 school year.

At the conclusion of the meeting, Parents handed to the Care Coordinator a copy of the Student's Progress Report for the 2008–2009 school year from Assets as well as a Student Profile for Spring 2009 (collectively "Spring 2009 Documentation"). (Tr. at 203.) According to these documents Student made functional academic progress at Assets. (RET, Exs. 31–32.) The Care Coordinator reviewed these documents, concluded that they showed Student had made improvement at Assets, but did not copy or provide the documentation to other members of the IEP team. (Tr. 247–49.)

On June 4, 2009, Defendant sent a Prior Written Notice ("PWN") to Parents. (RET, Ex. 7, at 103–04.) Listed on the PWN were the documents used to develop the IEP for the 2009–2010 school year. (Id. at 104.) The Spring 2009 Documentation, however, was not included on this list. Instead, the PWN merely

stated that "Parents provided the DOE school with the [Spring 2009 Documentation] for the purpose of adding it to [Student's] confidential educational records." (Id.)

Despite the IEP team's decision to place Student at Niu Valley, Parents continued to take steps towards enrolling Student at Assets. On June 18 2009, Parents paid for transportation for Student to attend Assets for the 2009-2010 school year. (ROA, Ex. 18, at 136.) On July 1, 2009, Parents became contractually obligated to pay Student's tuition for the 2009-2010 school year at Assets. (Id.) On July 23, 2010, they paid the tuition. (Id. at 137.)

By letter dated August 10, 2009, Parents informed Defendant for the first time that they disagreed with the IEP. (Doc. # 15, Pet'rs Exs. ("PET"), Ex. 15, 121.) They stated that as a result of the Defendant's failure to consider the Spring 2009 Documentation in developing the Student's IEP, they had "decided to reject the DOE's IEP and request that [Student] remain at Assets at the DOE's expense." (Id.) The Care Coordinator, to whom the letter was addressed, did not receive this letter until August 24, 2009. (Tr. at 213.)

The Care Coordinator responded via letter on August 31, 2009. (RET, Ex. 7, at 432.) She stated in the letter that the IEP team should reconvene "to review the information that was provided in the Assets Student Profile from Spring

2009." (Id.) Parents did not respond. (Tr. at 215.) The Care Coordinator again sent a letter requesting that the IEP team reconvene and Parents again did not respond. (Id. at 216.) Ultimately, Plaintiffs filed their request for an impartial hearing on October 16, 2009. (ROA, Ex. 18, at 139.)

II.     Hearings Officer's Decision

        In his decision, the Hearings Officer relied upon the testimony of the Care Coordinator and the Principal of Niu Valley in finding that the IEP provided a free appropriate public education ("FAPE"). (Id. at 139–41.) First he determined that the Care Coordinator had credibly and persuasively testified that the Spring 2009 Documentation provided by Assets was based on both informal and formal assessments. (Id. at 139.) The Hearings Officer also cited the Care Coordinator's statement that she would not rely on the Spring 2009 Documentation because there was "no explanation from [Assets] regarding how Student's functional grade level was determined." (Id. at 139–140.) The Hearings Officer credited the Care Coordinator's testimony that the IEP team considered a continuum of educational placements in determining the Student's least restrictive environment ("LRE"). (Id. at 140–41.) Finally, the Hearings Officer cited the Principal's testimony that the Spring 2009 Documentation had been given to the Care Coordinator and that

the Principal instructed the Care Coordinator to review it and bring it to the next IEP meeting.  (Id. at 141.)

In his conclusions of law, the Hearings Officer first addressed Plaintiffs' argument that Defendant should have conducted an evaluation to determine the harmful effects that a change of placement may have had on Student. (Id. at 142.)  He concluded that Plaintiffs provided "no credible evidence to support their argument that [Defendant] was required to conduct any ***evaluations*** to determine the potential harmful effects in regards to the determination of the LRE."  (Id.)  The Officer then summarily concluded that

> [t]he credible and convincing evidence did however, establish that the
> IEP team did consider any potential harmful effects to Student during
> th determination of Student's educational placement regarding the
> June 1, 2009 IEP.

(Id.)  The Hearings Officer did not cite to the record or discuss testimony in support of this conclusion.

Second, the Officer concluded that the Plaintiffs did not prove that Defendant failed to evaluate Student in all areas related to the suspected disabilities pursuant to 34 C.F.R. § 300.304(c)(4).  Here, the Hearings Officer determined the undisputed evidence demonstrated that assessments were performed and considered by the IEP team.  (Id. at 143.)

Next, the Officer concluded in one sentence that the Plaintiffs did not prove by a preponderance of the evidence that Defendant failed to conduct an evaluation of Student per 34 C.F.R. § 104.35(a). (Id. at 143–44.) He also concluded that the evaluations were conducted properly. (Id. at 144.)

Finally, the Hearings Officer concluded that the Defendant had provided Student with the appropriate LRE and that the outlined program in the June 1, 2009 IEP met Student's unique needs. (Id. at 144–45.) The Officer also addressed the PLEP section of the IEP and determined that it was appropriate. With respect to the Spring 2009 Documentation, the Hearings Officer stated:

> The Hearings Officer is not unmindful of the disparity between the PLEP information contained in the June 1, 2009 IEP, compared to the information in Student's academic records from [Assets.] However, in the absence of any evidence that the Home School had such information prior to the June 1, 2009 IEP, and in the absence of any testimony or other explanation as to the [sic] how [Assets] made their determinations as to functional grade levels, there is insufficient evidence for the Hearings Officer to find that the PLEP information in the June 1, 2009 [IEP] is inaccurate or inappropriate.

(Id. at 146.) The Hearings Officer therefore concluded that the IEP was not procedurally or substantively flawed. (Id. at 147.)

III.    Procedural History

On June 1, 2009, the IEP team met and developed a plan for Student for the 2009–2010 school year.  (PET, Ex. 6, at 71.)

On October 16, 2009, Plaintiffs filed their request for an impartial due process hearing.  (PET, Ex. 1, at 1–4.)

On March 4, 2010, the Hearings Officer found for the Defendant and concluded that there were no procedural or substantive errors the IEP.  (ROA, Ex. 18, at 147–48.)

On March 31, 2010, the Plaintiffs filed a complaint with the Court appealing the decision of the Hearings Officer.  (Doc. # 1.)  On June 2, 2010 the Defendant answered.  (Doc. # 17.)

## STANDARD OF REVIEW

The IDEA states, inter alia:

> [a]ny party aggrieved by the findings and decision made [pursuant to an administrative hearing], shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any state court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

20 U.S.C. § 1415(i)(2)(A).

When a party files an action challenging an administrative decision under the IDEA, a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); see also Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993). The party challenging the administrative decision bears the burden of proof. See Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d 1493, 1498 (9th Cir. 1996); Hood v. Encinatas Union Sch. Dist., 486 F.3d 1099, 1103 (9th Cir. 2007).

"[J]udicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." Ojai Unified Sch. Dist., 4 F.3d at 1471. District courts have discretion concerning how much deference to give to state educational agencies. Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987). Courts need not follow the traditional test that findings are binding if supported by substantial evidence or even a preponderance of the evidence. Id. A court may not, however, simply ignore the administrative findings. Ojai Unified Sch. Dist., 4 F.3d at 1474. Instead the decision must be given "due weight." J.L. v. Mercer Island Sch. Dist., 592

F.3d 938, 949 (9th Cir. 2010).  Given the expertise of the administrative agency and the political decision to vest the initial determination with the agency, deference to the hearing officer is warranted in cases where the officer's findings are "careful and thorough."  Id. (citing Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988)); Capistrano v. Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995).  Thus, district courts are free to determine how much deference to accord decisions of a hearing officer in light of the circumstances. County of San Diego v. Cal. Spec. Educ. Hearing Office, 93 F.3d 1458, 1466 (9th Cir. 1996).  However, "the ultimate determination of whether an IEP was appropriate is reviewed de novo."  A.M. v. Monrovia Unified Sch. Dist. __ F.3d __, Nos. 09-55169, 09-55478, 2010 WL 5095524, at * 3 (9th Cir. Dec. 15, 2010).

To determine whether a state has offered a FAPE, the Supreme Court has established a two-part inquiry.  Board of Education v. Rowley, 458 U.S. 176, 206 (1982).  First, whether the state complied with the procedures set forth in the IDEA.  Id.  Second, whether the IEP developed is reasonably calculated to enable the child to receive educational benefits.  Id. at 206–07.  If these requirements are met, the state "has complied with the obligations imposed by Congress and the courts can require no more."  Id.  If the inquiry is satisfied, questions of methodology are left for the state to decide, not the courts.  Id.

Procedural deficiencies do not automatically require a finding of denial of FAPE.  W.G. v. Bd. of Trs. of Target Range Sch. Dist., 960 F.2d 1479, 1484 (9th Cir. 1992).  Instead, the procedural deficiencies must result in the loss of educational opportunity or infringe upon the parents opportunity to participate in the IEP formulation process to warrant such a finding.  Id.  States are required only to provide a basic floor of opportunity through a program designed individually to provide educational benefits to a student.  N.S., 82 F.3d at 1498.

At the administrative level, the burden of proof is generally on the state to demonstrate compliance with the IDEA.  Seattle Sch. Dist., No. 1 v. B.S., 82 F.3d 1493, 1498 (9th Cir. 1996).  In Schaffer v. Weast, 546 U.S. 49 (2005), however, the Supreme Court was clear that the burden is placed on the party challenging the adequacy of the IEP plan at the administrative level.  Id. at 61-62.  The Ninth Circuit has since expanded the burden scheme developed in Schaffer to include challenges to the *implementation* as well as well as adequacy of an IEP plan.  Van Duyn v. Baker Sch. Dist. 5J. 502 F.3d 811, 820 (9th Cir. 2007).

Finally, arguments not raised in front of a hearings officer cannot be raised for the first time on appeal to the district court.  Indeed, "when a plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies, exhaustion of those remedies is required."  Robb v.

Bethel Sch. Dist. # 403, 308 F.3d 1047, 1048 (9th Cir. 2002); see also 20 U.S.C. § 1415(i)(2)(A); J.L., 575 F.3d at 1038. Exhaustion is not required, however, if it would be futile or offer inadequate relief, or if the agency has adopted a policy of general applicability that is contrary to the law. N.D. v. Hawaii Dept. of Educ., 600 F.3d 1104, 1110 (9th Cir. 2010). Further, an argument will not be waived even if it is not raised as a stand alone issue provided it was submitted as evidence of a denial of a FAPE. B.T. v. Department of Education, 676 F. Supp. 2d 982, 989 (D. Haw. 2009).

## DISCUSSION

I.   Deference to Hearings Officer's Decision

As an initial matter the Court must determine how much deference to accord the Hearings Officer's decision. See Gregory K., 811 F.2d at 1311 ("How much deference to give state educational agencies, however, is a matter for the discretion of the courts."). A court considers "a hearing officer's findings as thorough and careful when the officer participates in the questioning of witnesses and writes a decision containing a complete factual background as well as a discrete analysis supporting the ultimate conclusions." R.B. v. Napa Valley Unified Sch. Dist., 496 F.3d 932, 942 (9th Cir. 2007) (quotations and modifications omitted); Park v. Anaheim Union High Sch. Dist., 464 F.3d 1025,

1031 (9th Cir. 2006) (same). Indeed, an important consideration in determining whether a decision was careful and thorough is whether the hearings officer explains its legal conclusions thoroughly, "including citations to the relevant facts and the discussion of the applicable law." J.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 440 (9th Cir. 2010).

Having read the transcript and considered the record, the Court is concerned with the Hearings Officer's decision. While there is little question that the Hearings Officer meticulously reviewed the facts and participated in the questioning of witnesses at the hearing, the conclusions of law are sparse and cursory in nature. For instance, the Hearings Officer concluded in one sentence that Defendant conducted an evaluation pursuant to 34 C.F.R. § 104.35(a) without citing to the record. (ROA, Ex. 18, at 143.) Indeed, nearly all of the Hearings Officer's conclusions of law are conclusory in nature and the Officer rarely cited to facts on the record to support his conclusions. In a recent decision this Court did not accord deference to a Hearings Officer's decision where the Officer failed to reference which facts were relied upon to establish a conclusion. See C.P. v. Hawaii, No. 09-00393 DAE-BMK, 2010 WL 1962944, at *8 n.7 (D. Haw. May 16, 2010) ("Although Hearings Officer Alm laid out a detailed factual background, there is no reference to the evidence she actually relied upon in her conclusion as

to LRE.  It is therefore difficult for this Court to determine how much, if any, deference to afford Hearings Officer Alm's decision on this matter. In light of these circumstances, this Court will not afford Hearings Officer Alm deference on this matter.")  Similarly here, the Court cannot determine which facts the Hearings Officer relied upon in reaching his conclusions of law.  The Court will therefore grant the decision little deference.

II.     Spring 2009 Documentation

         The Defendant's failure to include and consider the Spring 2009 Documentation is the basis for the majority of the Plaintiffs' arguments.  Plaintiffs argue that by failing to consider these documents in drafting the IEP, the Defendant both procedurally and substantively denied Student a FAPE.  Specifically, Plaintiffs believe that Defendant did not consider an evaluation provided by the parents as required by 34 C.F.R.  § 300.502(c)(1) ("If the parent obtains an independent educational evaluation at public expense or shares with the public agency an evaluation obtained at private expense, the results of the evaluation . . . [m]ust be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child.").  Plaintiffs also allege that by omitting the Spring 2009 Documentation the IEP does not contain "[a] statement of the child's present levels of academic achievement

and functional performance." as required by 34 C.F.R. § 300.320(a)(1).  Finally,

Plaintiffs' arguments that Defendant did not provide the LRE to Student and that

Parents were denied a meaningful opportunity to participate in the IEP meeting

also hinge on the Defendant's failure to review the Spring 2009 Documentation.

See 34 C.F.R. §§ 300.114(a)(2), 300.324(b)(ii)(c).

With respect to the Spring 2009 Documentation, Defendant argues

that because the documentation was provided at the conclusion of the IEP meeting,

the IEP team could not have considered it before developing the IEP.  As a result,

according to Defendant, it did not need to be incorporated into the IEP.  The Court

is not persuaded.

In support of its contention, Defendant relies on Adams v. Oregon,

195 F.3d 1141 (9th Cir. 1999).  Adams involved an Individual Family Service Plan

("IFSP") relating to an autistic child under the age of three.[1]  Id. at 1145–46.  The

district court in Adams concluded it was impossible to determine whether the child

received a meaningful benefit towards his development because the IFSP provided

by the state was supplemented by private tutoring provided at the parents' expense.

---

[1] The case stemmed out of the infants and toddlers section of the IDEA.  20
U.S.C. § 1471(b)(1); Adams, 195 F.3d at 1148.  This part of the act provides for
early intervention services, at no cost to the family, for infants and toddlers with
disabilities and their families.  20 U.S.C. §§ 1471(b)(1), 1472(2)(A)–(F).

Id. at 1149.  The Ninth Circuit concluded this analysis was "clear error" because the district court had asked "whether the IFSP was adequate in light of the [child's] progress" instead of "the more pertinent question of whether the IFSP was appropriately designed and implemented so as to convey the child with a meaningful benefit."  Id.  The Ninth Circuit continued:

> We do not judge an IFSP in hindsight; rather, we look to the IFSP's goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer Lucas with a meaningful benefit.

Id.  In reaching this conclusion, the Ninth Circuit quoted the Third Circuit's decision in Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1041 (3d Cir. 1993):

> Actions of the school systems cannot . . . be judged exclusively in hindsight . . . .  [A]n individualized education program ("IEP") is a snapshot, not a retrospective. In striving for "appropriateness," an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted.

Adams, 195 F.3d at 1149 (quoting Fuhrmann 993 F.2d at 1041).

The facts in the instant case are easily distinguishable.  The Ninth Circuit was considering whether the district court erred in using a child's *subsequent* progress as a measure of a plan's adequacy.  Indeed, Adams has been cited for this exact proposition of law on numerous occasions.  See, e.g., J.W., 626

17

F.3d at 439; <u>JG v. Douglas Cnty. Sch. Dist.</u>, 552 F.3d 786, 801 (9th Cir. 2008);

<u>Tracy N. v. Dep't of Educ.</u>, 715 F. Supp. 2d 1093, 1112 (D. Haw. 2010).  Here

Plaintiffs are not asking the Court to consider Student's subsequent progress to

determine whether the IEP was appropriate, instead they are arguing that vital

documentation, provided to Defendant before the IEP's implementation, was

excluded from the IEP development process.

  Defendant's argument that it did not need to consider the Spring 2009

Documentation because it was provided at the conclusion of the meeting after the

IEP had already been developed is also without merit.  The Ninth Circuit has been

clear, a court judges the adequacy of a plan in light of the surrounding

circumstances and documents "at the time the plan was implemented."  <u>Adams</u>,

195 F.3d at 1149.  Here the documentation was provided weeks in advance of the

implementation of the IEP.[2]  Defendant would have this Court craft a rule whereby

---

[2] To the extent the Defendant relies on language in <u>Fuhrmann</u> where the
Third Circuit said a court should look at language "at the time the IEP was drafted"
in support of its argument, the Court is not persuaded.  993 F.2d at 1041.  In and
since <u>Adams</u>, the Ninth Circuit has been clear that the critical time frame to judge
an IEP's adequacy is at the time of its implementation rather than when it was
drafted.  <u>Adams</u>, 195 F.3d at 1149 ("[W]e look to the IFSP's goals and goal
achieving methods at the time the plan was *implemented*." (emphasis added));
<u>J.W.</u>, 626 F.3d at 439 ("We do not judge an [IEP] in hindsight; rather, we look to
the [IEP's] goals and goal achieving methods at the time the plan was
*implemented*" (emphasis added)); <u>JG</u>, 552 F.3d at 801 ("We consider the IEP at the
(continued...)

documentation provided immediately before the close of an IEP meeting would have to be included in the IEP but documentation provided immediately after the meeting—or even at its conclusion—could be excluded. The Court sees no reason to draw such a fine distinction, especially in light of Ninth Circuit precedent to the contrary.

The law in the Ninth Circuit is clear: "A school district cannot abdicate its affirmative duties under the IDEA" irrespective of parental conduct. See N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202, 1209 (9th Cir. 2008). In Target Range, for example, the plaintiffs and school district scheduled an IEP meeting in which the parents promised to secure the attendance of Student's private school teacher. 960 F.2d at 1481. The teacher did not attend the IEP meeting. Id. Nevertheless, the district began to prepare an IEP. Id. at 1482. The student's parents refused to participate and provided a list of ten factors they wanted the IEP to consider. Id. The Ninth Circuit held that it was the district's responsibility to ensure that the student's teacher attended the meeting. Id. at 1484. The court also determined that the parents were under no obligation to file a subsequent dissent to the IEP because "[t]he school district was well aware of their

---

[2](...continued)
time of its *implementation*, not in hindsight." (emphasis added)); see also Tracy N., 715 F. Supp. 2d at 1112 (same).

concerns [that were] outlined in detail in the document [given] to

the . . . principal." Id. at 1485.  Accordingly, the Ninth Circuit affirmed the district

court's decision that a FAPE was denied to the student.

The Court finds a similar result is warranted here.  Well before the

IEP was implemented, Parents handed to the Care Coordinator the Spring 2009

Documentation.  (See Tr. at 203.)  Although delivered without explanation at the

end of the IEP meeting (id.), the Care Coordinator reviewed the documentation and

concluded it demonstrated Student had made improvement at Assets.  (Id. at

247–49.)  Nonetheless, Defendant issued its PWN four days later.  (RET, Ex. 7, at

103–04.)  Listed on the PWN were the documents used to develop the IEP for the

2009–2010 school year.  (Id. at 104.)  The Spring 2009 Documentation, was not

included.  Instead, the PWN merely stated that "Parents provided the DOE school

with the [Spring 2009 Documentation] for the purpose of adding it to [Student's]

confidential educational records."  (Id.)  This was insufficient.

That Parents did not object to the IEP until after the beginning of the

2009–2010 school year[3] does not excuse Defendant's failure to consider the Spring

---

[3] There is some question as to when exactly the Parents reached out to
Defendant.  The Care Coordinator testified that the letter was not received until
August 24, 2009.  (Tr. at 213.)  The letter itself, however, was dated August 10,
2009.  (PET, Ex. 15, 121.)  Even assuming Parents sent the letter on August 10,
(continued...)

2009 Documentation before implementing the IEP. Once a state is on notice of a potential flaw in the IEP's development, it is responsible for correcting it irrespective of parental conduct. See, e.g., N.B. 541 F.3d at 1209–10 (finding where an IEP team was "on notice that [the student] likely suffered from some form of autism" it was insufficient merely to advise the student's parents to have the student evaluated); Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994) (finding where "[t]he District was aware that [student] was diagnosed with autism" it was immaterial that parents withheld a portion of doctor's report); JG, 552 F.3d at 794 ("A school district has an independent duty to evaluate children after notice that they may have learning disabilities . . . [n]otwithstanding the parents' conduct."). Here, the Defendant was aware that a more recent evaluation than those used to prepare the PLEP and IEP existed but did not attempt to revise the IEP accordingly. As in Target Range, parents were under no obligation to file a subsequent dissent to the IEP because "[t]he school district was well aware of their concerns . . . ." Id. at 1485. Thus, the Court finds that there was procedural

---

[3](...continued)
that is still well after July 26, 2009, the start of the 2009–2010 school year. (ROA, Ex. 18, 136.)

error in the development of the IEP.[4]  Specifically, Defendant did not consider an evaluation provided by Parents in accordance with 34 C.F.R. § 300.502(c)(1), nor did the PLEP contain an accurate "statement of the child's present levels of academic achievement and functional performance" as required by 34 C.F.R. § 300.320(a)(1).

Although procedural errors do not necessarily result in the denial of FAPE, see Target Range, 960 F.2d at 1484, the Court finds that here the errors were sufficiently grave to warrant such a finding.[5]  This is especially so given that the Spring 2009 Documentation demonstrated that Student had made improvement at Assets.  (See RET, Exs. 31–32; Tr. 247–49.)  Accordingly, the Court **VACATES** the Hearings Officer's decision and **REMANDS** the case to Defendant Department of Education

---

[4] The Court here notes that this is not the first case where parents, either on their own or with the advice of an advocate, have seemingly waited until an opportune moment to "slip" the Defendant an evaluation and then later complain that it was not considered in the IEP.  This type of fundamental unfairness should not be tolerated.  This Court would therefore suggest that prior to or during the IEP meeting, IEP team members affirmatively request whether the parents or their representatives have any additional materials or information that they would like the other IEP team members to consider.

[5] Having concluded that a FAPE was denied Student, the Court does not reach Plaintiffs' remaining contentions.

At the hearing the parties represented to the Court that Student has been at Assets during the pendency of this appeal process and that, pursuant to the Stay Put Provision of the IDEA, Defendant has paid for Student's continued attendance.[6] This includes both the 2009–2010 and 2010–2011 school years. Given that Defendant has already paid Student's tuition for these school years, the Court does not believe that finding for Plaintiffs will financially affect the parties or alter Student's placement. If this Court's finding, however, does affect Student's placement at Assets for the 2010–2011 school year, the Court instructs Defendant to reevaluate Student's 2009–2010 and 2010–2011 IEPs in light of the Spring 2009 Documentation as well as all other recent and relevant documentation.

_____

[6] Section 1415(j), the Stay Put Provision, reads:

[D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j).

## CONCLUSION

For the reasons stated above, the Court **VACATES** the Hearings Officer's Findings of Fact, Conclusions of Law and Decision and **REMANDS** the case to the Defendant Department of Education.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, January 24, 2011.

_____
David Alan Ezra
United States District Judge

Marc M. v. Department of Education, Civ. No. 10-00195 DAE/LEK; ORDER VACATING AND REMANDING DECISION OF HEARINGS OFFICER